IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LORI CORBETT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 07 C 4768 |
| ) | |
| CYTYC CORP. and CYTYC ) | |
| L.P. (now known as HOLOGIC L.P.), ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Lori Corbett has sued Cytyc Corporation and Cytyc L.P. (collectively, Cytyc), asserting a claim for gender discrimination and a claim for retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5. Cytyc has moved for summary judgment on all of Corbett's claims. For the following reasons, the Court denies Cytyc's motion.

### Facts

Because Cytyc has moved for summary judgment, the Court views the facts in the light most favorable to Corbett and draws reasonable inferences in her favor. *See, e.g.*, *Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008).

Corbett began working for Cytyc in June 2005 as a Professional Medical Representative (PMR). Cytyc sells medical devices and diagnostic equipment. As a

1

PMR, Corbett was essentially a sales representative for Cytyc. She worked in tandem with a Territory Manager (TM) to sell Cytyc products to doctor's offices and hospitals in the Chicago area. Corbett was charged with selling Cytyc's NovaSure device and procedure, an endometrial ablation system used to treat women with heavy menstrual bleeding. The device has both sterile and nonsterile components. Though TMs are authorized to train doctors on the NovaSure procedure, known as "covering a case," PMRs are not.

During her employment, Corbett worked under three different District Sales Managers: Jamie Goetz, followed by Whitney Parachek and Michael Rodriguez. Corbett had a good relationship with Parachek and often received praise from her and others for her work. Corbett's relationship with Michael Buhle, the TM with whom she worked, was not as positive. Buhle also had trouble making sales quotas. Cytyc management placed Buhle on a performance improvement plan in 2004, and Parachek issued a Letter of Concern in June 2006 for poor performance.

In August 2006, Rodriguez replaced Parachek as DSM for Chicago. Shortly afterwards, Buhle told Rodriguez about issues he had with Corbett. Buhle reported that he did not get along well with Corbett and that he thought she was difficult to work with. He also told Rodriguez about a recent incident. In late 2005 or early 2006, Buhle said, he told Corbett that a doctor had complained that she had missed appointments and asked that she not return to the doctor's office. Some time later, Corbett returned to the doctor's office, and a staff member called Buhle to complain that Corbett argued with the doctor's staff in front of patients. The customer also said that Corbett spoke negatively about Buhle in front of staff and patients.

2

On August 23, 2006, Corbett called Rodriguez to discuss issues relating to the territory. She told him that Buhle had missed several cases and that doctors were upset with him. Corbett contends that Rodriguez told her she was being too emotional. Rodriguez asserts that Corbett was overly confrontational, bordering on insubordinate, but he cannot recall telling her she was being emotional. After Rodriguez ended the phone call so that he could board an airplane, Corbett called him again. Though Rodriguez claims he counseled her on learning boundaries and self-awareness, Corbett denies that he did so. Following this conversation, Rodriguez took three weeks off to get married and go on his honeymoon. Shortly after Rodriguez returned to work, Buhle resigned.

In the third week of September 2006, Corbett contacted Chris Gormley, a Surgical Sales Specialist (SSS), to cover a NovaSure case. After he did so, the office manager asked Gormley to notify Cytyc management that Corbett was overly pushy and that the office did not want to work with her anymore. Gormley reported the complaint to Rodriguez.

Around the same time, Rodriguez began investigating potential replacements for Buhle. Corbett submitted a letter of interest to Rodriguez along with two recommendation letters from doctors with whom she had worked. Jay Malayny, a male SSS who had been working for Cytyc for nine months, also expressed interest in the position. Cytyc materials describe the qualifications for the TM position as including a minimum of five years of sales experience.

Rodriguez discussed the candidates with Brooks Edlund, his superior. Edlund was generally aware of some complaints about Corbett's behavior, and Rodriguez told

3

him of Buhle's and Gormley's complaints. Rodriguez also told Edlund about the telephone conversation he had with Corbett in August 2006. After this discussion, Rodriguez decided that he would not interview Corbett for the TM position. Rodriguez did not inform Corbett about this decision and failed to return Corbett's calls and e-mails regarding the possible promotion.

In early October 2006, Rodriguez interviewed Malayny for the TM position at a sales meeting in Arizona. Malayny had a positive NovaSure sales record, even though he had worked for Cytyc for only nine months. There were no reports of issues with Malayny's behavior or with his ability to get along with co-workers.

On October 10, 2006, Rodriguez set up a lunch meeting with Corbett for the next day. In an e-mail, Rodriguez informed Corbett that he wanted to discuss goals for the next quarter, the transition of the new TM, and Corbett's carreer development path. Rodriguez contends that he sought advice on how to deal with Corbett. He testified that he left a voice message for Anne-Marie Hodkinson at Cytyc's human resources department (HR) that same day. Hodkinson could not, however, confirm that Rodriguez called her or left her a message that day.

Before the lunch meeting the following day, Corbett called Melissa Climaco, another TM, for help with a situation at a doctor's office. Climaco thought that Corbett was "covering a case," *see supra* at 2, in violation of company policy. Although Corbett attempted to explain that she was not covering a case, Climaco reported her opinion to Rodriguez Shortly afterwards, Rodriguez went to the lunch meeting.

At the lunch meeting, Rodriguez informed Corbett that Malayny had been promoted to TM. Corbett asked Rodriguez why she had not been interviewed; he

4

responded that he did not think she was ready to become a TM. Rodriguez contends that he discussed Corbett's customer issues and teamwork difficulties as reasons why she was not promoted. Corbett denies that Rodriguez said these things. Instead, she recalls that the only reason Rodriguez gave for not promoting her was that her former managers had reported that she was not ready. Though Corbett claims that she questioned Rodriguez calmly, he contends that she was confrontational and unruly. Rodriguez claims that he discussed problems with her covering a case that morning, but Corbett denies that he ever mentioned this.

Corbett claims that she complained to Rodriguez about gender discrimination. Although she admits that she never used the words gender, sex, or discrimination, she complained that Rodriguez favored Buhle over her, ignored her phone calls and e-mails about the promotion, and promoted Malayny, a less qualified male, instead of her. She then told Rodriguez that she would go to HR with this issue. At that point, she claims, Rodriguez threatened that he would go to HR himself. Rodriguez contends that Corbett threatened to go to HR and that he responded that he was happy to include HR and had already contacted HR.

That evening, Rodriguez called Rob Anderson, a Cytyc SSS, and asked Anderson to send him an e-mail detailing any incidents or problems with Corbett. Anderson sent an email describing his first meeting with Corbett, in which, he said, she claimed to be awaiting a promotion to TM and told Anderson he should do as she said. Anderson also recalled in the e-mail that Corbett had left boxes containing sterile equipment at a coffee shop when he was late meeting her to pick up the equipment. When Anderson finally picked up the equipment, he said, the boxes were stained with

5

coffee. Anderson's e-mail mentioned a few other issues, including customer complaints regarding Corbett and Anderson's claim that Corbett had screamed at him over the phone.

Rodriguez also received an e-mail from Climaco that evening. Climaco detailed the situation from earlier in the day when Corbett called her for help. Climaco noted that Corbett reacted in a confrontational way when Climaco told Corbett that she could have been liable if something had gone wrong.

Rodriguez received another email early the next morning from Gormley, a Cytyc SSS. Although Gormley had previously reported the customer complaint about Corbett from late September, Rodriguez asked him to document it in an e-mail. Gormley stated that Rodriguez may have asked him to send the e-mail on October 11, 2006.

On October 12, Rodriguez and HR representative Hodkinson spoke about Corbett. Based on the complaints Rodriguez presented and other complaints Hodkinson had recently heard, Hodkinson determined that she had never seen so many complaints related to one person. Neither Hodkinson nor Rodriguez contacted Corbett to discuss any of the complaints.

In the following days, Hodkinson and Rodriguez also discussed with Edlund, Rodriguez's manager, the complaints against Corbett. By October 20, Rodriguez, Edlund, and Hodkinson had decided to terminate Corbett. On October 23, Rodriguez forwarded to Hodkinson the e-mails he had received from Climaco, Anderson, and Gormley.

On October 25, 2006, Rodriguez, Edlund and, via telephone, Hodkinson met with Corbett to break the news of her termination. As the reasons for the termination, they

offered the recent complaints from customers and Cytyc staff about difficulties working with Corbett and the incident Anderson reported in which Corbett had left medical equipment unattended at a coffee shop. The managers knew of the incident reported by Climaco regarding Corbett possibly covering a case but did not mention it.

Cytyc ultimately terminated Corbett on October 25, 2006. Rodriguez, Edlund, and Hodkinson informed Corbett that she was being terminated because she was unprofessional and had left medical devices in an unsecured location. On the termination form, filed out by Hodkinson, the stated reason for Corbett's termination was performance, not misconduct.

Corbett filed suit on August 23, 2007, asserting a claim for gender discrimination for failure to promote and a claim for retaliation in violation of Title VII.

**Discussion**

Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). To determine whether a genuine issue of material fact exists, the Court must view the record in the light most favorable to the nonmoving party and draw reasonable inferences in that party's favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986); *Lesch v. Crown Cork & Seal Co.*, 282 F.3d 467, 471 (7th Cir. 2002). A genuine issue of triable fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

### A. Failure to promote

Claims for discrimination under Title VII "may be proved either directly . . . or indirectly under the burden-shifting method established in *McDonnell Douglas*." *Scaife v. Cook County*, 446 F.3d 735, 739 (7th Cir. 2006) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973)). Corbett attempts to establish her claim for failure to promote using both methods. Because she survives summary judgment via the direct method, the Court need not address the indirect method.

Under the direct method, a plaintiff can avert summary judgment by presenting enough evidence of discriminatory intent to create a genuine issue for trial. *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 616 (7th Cir. 2000). The plaintiff may proceed under the direct method through the use of either direct or circumstantial evidence, "which suggests discrimination albeit through a longer chain of inferences." *Lewis v. City of Chicago*, 496 F.3d 645, 651 (7th Cir. 2007) (quoting *Luks v. Baxter Healthcare Corp.*, 467 F.3d 1049, 1052 (7th Cir. 2006)). A fact-finder may infer discriminatory intent from three types of circumstantial evidence: (1) suspicious timing, ambiguous statements leading to an inference of discriminatory intent, (2) statistical evidence of systematically disparate treatment, and (3) "evidence that the plaintiff was qualified for the job in question but passed over in favor of . . . a person not having the forbidden characteristic and that the employer's stated reason for the difference in treatment is unworthy of belief." *Rudin v. Lincoln Land Cmty. College*, 420 F.3d 712, 720 (7th Cir. 2005).

Corbett contends that several items of circumstantial evidence give rise to the inference that Cytyc, specifically through Rodriguez's actions, discriminated against her when it promoted Malayny instead of her to the open TM position. First, Corbett points to statistics showing that more men than women occupy the TM position and that proportionally more men than women are promoted from PMR to TM. Although this kind of evidence may be used to support a claim under the direct method, "[s]tatistical evidence which fails to properly take into account nondiscriminatory explanations does not permit an inference of discrimination." *Radue*, 219 F.3d at 618-19 (internal quotation marks and citations omitted). Corbett's statistics do not appear to take account of a nondiscriminatory explanation for the disparity—more men than women, and more male PMRs than female PMRs, applied for TM positions. The Court cannot say that a reasonable jury could find that this evidence, by itself, "strongly suggests" that her failure to attain the promotion "was a result of intentional discrimination." *Id.* at 619 (holding that plaintiff's failure to rule out nondiscriminatory explanations precluded plaintiff from proving discrimination using only the statistical evidence).

Corbett has, however, produced other evidence that a reasonable jury could find suggests a discriminatory motive. First, Corbett asserts that Rodriguez failed to respond to her requests for information about the open position and told her that the position was still open, even after he had decided to hire Malayny. Though Rodriguez denied lying to Corbett about the status of the promotion, a jury reasonably could credit Corbett's testimony and conclude that Rodriguez lied.

In addition, a jury reasonably could find that Cytyc has offered at least four different explanations for not promoting Corbett: Corbett's former manager, Whitney

9

Parachek, told Rodriguez that she was not ready for the job; Corbett had previously turned down a different promotion; Buhle's and Gormley's reports about Corbett's behavior; and Malayny was the most qualified applicant for the position. Corbett has offered evidence arguably undercutting several of these proffered explanations. First, Corbett disputes that Parachek ever told Rodriguez that she was not ready to be TM, asserting that Rodriguez never discussed her performance with Parachek while he was considering candidates for the position. Next, Corbett argues that Cytyc's second reason, offered to the EEOC in a letter prepared by Hodkinson after Corbett's termination, is false. Cytyc asserts that its position statement should not be given substantial weight. *McCoy v. WGN Cont'l Broad. Co.*, 957 F.2d 368 (7th Cir. 1992). Although the Seventh Circuit declined to hold that any explanation contradicting a position taken before an administrative agency is *per se* pretextual, it did not foreclose the consideration of an EEOC position statement as circumstantial evidence of discrimination. Cytyc does not contest that Corbett's allegation that Cytyc's explanation in the position statement was false.

Finally, Corbett contends that Malayny failed to meet the minimum qualifications for the TM position, but she exceeded them. Cytyc lists "[a] minimum of 5 years of demonstrated successful sales performance with current and previous employers, including success as a medical/surgical sales representative," as part of its "preferred experience and skills" for the TM position. Pl. Ex. 25. Malayny had no medical sales experience except for his nine months at Cytyc. In contrast, Corbett had six years of medical sales experience including about sixteen months with Cytyc. Furthermore, Cytyc's policy of internal promotions stated that to be eligible for a position, an

employee should be in his or her "current position for at least [twelve] months." Pl. Ex. 26. As noted earlier, Malayny had worked at Cytyc for only nine months.

Corbett asserts that this evidence, considered as a whole, is sufficient to allow an inference of discrimination.[1] Though it is a close call, the Court agrees. Although Cytyc offers explanations for its arguably shifting reasons for not promoting Corbett and asserts that the requirements for the TM position are generally relaxed for internal hires, the Court must look at the evidence in the light most favorable to Corbett. Through this lens, the Court concludes that a reasonable jury could infer a discriminatory intent from Rodriguez's alleged misrepresentations on the status of the promotion, Cytyc's shifting explanations for not promoting Corbett, and Malayny's promotion in spite of the fact that he arguably fell short of the specified qualifications.

**B.     Retaliation**

"Title VII makes it unlawful for an employer to discriminate against any of his employees" because the employee has opposed an unlawful employment practice. *Brewer v. Bd. of Trs. of Univ. of Illinois*, 479 F.3d 908, 923 (7th Cir. 2007) (internal quotation marks and citations omitted). Like failure to promote claims, retaliation claims may be proven either directly or indirectly. *See Lewis*, 496 F.3d at 655.

---

[1] Corbett also contends that Cytyc "grooms" male employees and that it groomed Malayny by placing him in Detroit, a high sales area. These claims are pinned entirely on a single ambiguous statement in Malayny's deposition testimony. Malayny said, "[so] what they decided to do is to show that I could put up good results, hopefully, for future opportunities." Pl. Ex. 7 at 66. Without more, this speculative statement is insufficient to support a reasonable inference that Cytyc was "grooming" Malayny or any other male.

11

Under the direct method, Corbett must show that she "(1) engaged in a statutorily protected activity; (2) suffered an adverse employment action; and (3) that a causal connection exists between the two." *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006). Because it is undisputed that Corbett suffered an adverse employment action when she was terminated on October 25, 2006, the only elements at issue in the present case are the first and the third.

To satisfy the first element, "a plaintiff must show that she opposed conduct prohibited by Title VII, or at a minimum that she had a reasonable belief she was challenging such conduct." *Gleason v. Mesirow Financial, Inc.*, 118 F.3d 1134, 1147 (7th Cir. 1997). She must communicate her complaint directly to her employer. *Id.* Corbett contends that she complained to Rodriguez during their lunch meeting on October 11, 2006, that he hired Malayny, a less qualified male, instead of her and that he treated male employees more favorably than he treated her. Cytyc argues that Corbett's conversation with Rodriguez did not constitute protected activity because she never complained of discrimination based on sex or gender. Cytyc's assertion that Corbett must use the magic words "sex" or "gender" ignores important case law on the subject. "An employee, of course, need not use the words '[sex] discrimination' to bring her speech within Title VII's retaliation protections." *Miller v. American Family Mut. Ins. Co.*, 203 F.3d 997 (7th Cir. 2000). She need only say something to indicate that she is being treated less favorably than others based on her gender. *See id.* Viewing the evidence in the light most favorable to Corbett, a reasonable jury could find that she did just that. Corbett asserts that she complained of disparate treatment, named the male

12

employees she felt were being treated more favorably, and told Rodriguez that she would go to HR with the complaints. Although Rodriguez's and Corbett's accounts differ as to exactly what was said, that poses a credibility issue inappropriate for summary judgment.

Turning to the third element, temporal proximity alone is typically insufficient to show that an adverse employment is causally connected to the protected activity. *Lewis*, 496 F.3d at 645. An employee "must also put forth other evidence that reasonably suggests that her protected speech activities were related to her employer's discrimination and termination." *Burks v. Wisconsin Dept. Of Transp.*, 464 F.3d 744, 759 (7th Cir. 2006). Corbett points to Rodriguez's solicitation of e-mails from Climaco, Gormley, and Anderson just hours after his October 11 meeting with Corbett, at which she made the complaint about differential treatment. Rodriguez then arranged a meeting with Hodkinson at HR the following day. Though Rodriguez contends that he contacted Hodkinson on October 10, before his meeting with Corbett, Hodkinson testified that she did not hear from Rodriguez until October 11, suggesting that he did not contact Hodkinson until after his meeting with Corbett. This evidence would allow a jury to infer that Rodriguez arranged the meeting Hodkinson because of his encounter with Corbett, planning seek her termination, and that he specifically solicited complaints about her to influence Hodkinson.

Cytyc argues that Corbett was terminated because she displayed so many behavioral problems in a short period of time. Hodkinson testified that she had never seen so many problems relating to a single employee. A reasonable jury could find, however, that Rodriguez orchestrated this by soliciting the e-mails and then giving them

13

to Hodkinson all at once. Cytyc also highlights the incident in which called Climaco to help troubleshoot a case, asserting that it represented a severe breach of company policy. None of the managers cited that incident to Corbett, however, when they discussed the reasons for her termination. In any event, Corbett produced evidence that many other employees with conduct problems received progressive discipline, such as performance improvement plans and letters of concern. In contrast, Cytyc never took disciplinary action before terminating Corbett in October 2006. This, combined with the circumstances of Rodriguez's alleged arrangement of the meeting with Hodkinson and his solicitation of adverse e-mails just after Corbett complained about differential treatment, provides the additional evidence necessary to support a finding of retaliation.

Because Corbett's retaliation claims survive summary judgment under the direct method of proof, the Court need not address the indirect method.

**Conclusion**

For the foregoing reasons, the Court denies defendant's motion for summary judgment [docket no. 76]. The case is set for a status hearing on November <u>24</u>, 2008 at 9:30 a.m. for the purpose of setting a trial date and discussing the possibility of settlement.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: November 7, 2008